1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>        v.<br><br>ANDREW LEFT, and CITRON CAPITAL, LLC,<br><br>                              Defendants. | Case No. 2:24-cv-06311-SPG-JC<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS [ECF NO. 19]** |

18
19
20
21
22
23

Before the Court is a motion to dismiss, (ECF No. 19 ("Motion")), filed by Defendants Andrew Left and Citron Capital, LLC (collectively, "Defendants"). Plaintiff Securities and Exchange Commission ("Plaintiff" or "SEC") timely opposed, (ECF No. 21 ("Opp.")), and Defendants replied (ECF No. 23 ("Reply")). Having considered the parties' submissions, oral arguments, the relevant law, and the record in this case, the Court DENIES the Motion.

24

## I.    BACKGROUND

25
26
27
28

The Complaint alleges as follows. Defendant Andrew Left ("Defendant Left") is an "activist short publisher," who operates and controls "Citron Research," an online platform. (ECF No. 1 ("Compl.") ¶ 4). Between approximately March 2018 to December 2020 (the "Relevant Period"), Defendant Left posted written reports and email blasts, as

well as tweets from an associated Twitter Account, (collectively, "Citron publications") concerning 23 companies (hereinafter, "target companies") on at least 26 occasions. (*Id.* ¶¶ 4–5, 26, 29–30). The Citron publications often included information about the target companies, statements that Citron had taken a long or short position[1] in stocks issued by the target companies, the projected direction the target companies' stock prices were moving towards, and statements encouraging readers to take short or long positions in the target companies' stock. (*Id.* ¶¶ 25, 30). Citron Research's Twitter account garnered a following of more than 100,000 people. (*Id.* ¶ 4).

During the Relevant Period, Defendant Left also operated and controlled Citron Capital, LLC ("Citron Capital"), an investment advisor entity. (*Id.* ¶ 36). According to the Complaint, using Citron Research and Citron Capital, Defendant Left engaged in an alleged fraudulent scheme as follows. (*Id.* ¶¶ 6, 36). First, Defendants would establish long or short positions in a target company through equity shares. (*Id.* ¶ 6). Then, Defendant Left, through Citron Research, would issue Citron publications that represented to his readers and the market he had long or short exposure in the target company. (*Id.* ¶¶ 6, 44, 46). Importantly, Defendant Left also would recommend to his readers that they trade in the same direction as his positions. (*Id.* ¶ 6). Additionally, in many cases, Defendant Left would give his readers a purported target price—meaning a price at which, he predicted, the target company's stock would trade. (*Id.*). Per the Complaint, Defendant

---

[1] As the Complaint explains, "[a]n investor typically takes a 'long' position when he or she anticipates that the value of the security will increase." (Compl. ¶ 20). Thus, if the stock price increases, then the investor could gain profit when he sells his shares at a price higher than his original purchase price. (*Id.*). In contrast, "[a]n investor typically takes a 'short' position when he or she anticipates that the price of the security will decrease." (*Id.* ¶ 21). When an investor makes a "short sale," he is essentially borrowing the security from a broker-dealer or institutional investor and then subsequently selling that security to a purchaser. An investor could "cover" or "exit" his short position by buying back the security from said purchaser and returning it to the original lender. (*Id.*). Thus, if the stock price decreases, then the investor could gain profit by purchasing that security at a price lower than his original short sale price. (*Id.*).

Left's predicted target price was typically far above (for long publications) or far below (for short publications) the stock's current trading price, which created an impression in the market that the target company's stock price would drastically increase or decrease in the same direction as Citron Research's recommendation. (*Id.* ¶ 52).

Following his Citron publications, the price of these target stocks, according to Plaintiff, would "move[] on average more than 12%." (*Id.* ¶¶ 6, 87). Unbeknownst to his readers, however, Defendant Left simultaneously intended to and did capitalize on such market movement by "quickly revers[ing] his own positions in the equity shares and options—which he had induced readers to follow—but at prices far higher (or lower) than the price targets . . . ." (*Id.* ¶ 6). Stated differently, Defendant Left would buy back stocks "almost immediately after telling his readers to sell" the stocks at a given target price and would sell stocks "almost immediately after telling his readers to buy" such stocks at a given target price. (*Id.* ¶ 59). Using his personal accounts and accounts in the name of Citron Capital to purchase and sell stocks of the target companies, Defendant Left and Citron generated approximately $20 million in trading profits. (*Id.* ¶¶ 5–6, 12, 207).

At the time he was issuing stock recommendations and price targets, the Complaint alleges Defendant "Left knew, or was reckless and negligent for not knowing, that investors often bought or sold stock in response to Left and Citron Research's recommendations, and thus his stock recommendations in the tweets or reports impacted the market." (*Id.* ¶ 48). Yet, Defendant Left did not disclose in the Citron publications that he intended to quickly trade in a manner that was inconsistent with those recommendations and concealed his own financial motivations for issuing the Citron publications. (*Id.* ¶¶ 83–85).

According to the Complaint, as part of Defendants' scheme, Defendants also engaged in other conduct Plaintiff alleges was deceptive. As examples, "to present Citron Research as an independent publication to investors, Defendants posted purported 'investor letters' to create the false impression that Citron Capital was a successful hedge fund with investors," (*id.* ¶ 7) and returns in the double and triple digits, (*id.* ¶¶ 32–33). In actuality,

however, Citron Capital never had any outsider investors and, instead, was used by Defendant Left "to trade his own money." (*Id.* ¶¶ 7, 35). Further, Defendants created anonymous websites to legitimize and amplify the recommendations in the Citron publications to induce more trading activity in certain target companies and generate higher profits. (*Id.* ¶ 7). As one example, Plaintiff alleges that Defendant Left created an anonymous website to promote negative reports about a target company with the ultimate purpose of influencing readers to quickly sell their stock in that company at a low target price. *See, e.g.*, (*id.* ¶ 167). However, Defendants allegedly sold some of their stock in that same target company at a much higher price. (*Id.* ¶¶ 164–65).

Additionally, to bolster Citron Research's reputation in the market as an independent research publication and support his trade recommendations, Defendant Left made the materially false and misleading statement to Citron Research readers that he, Citron Research, and Citron Capital had never been compensated by a third-party to publish research. (*Id.* ¶¶ 152–53, 155, 191). Contrary to these statements, alleges Plaintiff, Defendant Left had received substantial trading profits from two outside hedge funds in exchange for Defendant Left's use of Citron publications to make trade recommendations to the platform's readers and the market in connection with the offer or sale of securities in certain target companies. (*Id.* ¶¶ 7, 154, 158, 215). Defendant Left allegedly amassed over $1.1 million in his share of Anson's trading profits garnered from his tweets containing negative information about the target companies. (*Id.* ¶ 174). Further, to conceal these payments provided by the outside fund, Defendant Left caused a third-party intermediary to create "sham" invoices purporting to charge the outside fund for research that was never actually conducted by the third-party intermediary and then, to obtain the amounts the outside fund paid to the intermediary on the "sham" invoices, issued fabricated invoices to the third-party intermediary for purported consulting services Defendant Left never actually provided to the third-party intermediary. (*Id.* ¶¶ 7, 168–77). According to Plaintiff, concealing such information contributed to this overall false promotion that Citron Research's publications remained independently insulated from external hedge

funds' influence. In other words, Defendants deceptively led readers to trust that external hedge funds never swayed Citron Research's trading content. (*Id.* ¶¶ 191–93). The Complaint, in sum, alleges that Defendants' fraudulent practice deceived investors and allowed Left to use his Citron publications to lead investors to believe the publications "were truthful independent stock recommendations, when in fact they contained false statements or misleading half-truths intended to create catalysts to move the target company's stock price so that [Defendant] Left and Citron Capital could profit." (*Id.* ¶¶ 6, 60).

Plaintiff identifies in both the Complaint and an Appendix attached to the Complaint specific deceptive acts and statements that Plaintiff alleges were materially false, misleading, and contained half-truths at the time the statements were made in connection with Defendants trading in the stock of certain target companies and publishing the companies' target stock prices. *See e.g.,* (*id.* ¶¶ 90–146, 168–73, 184–90, 196–98, 200–07 and Appendix A). The Complaint also describes conduct and private statements made by Defendant Left that it alleges illuminate the fact that Defendant Left "acted knowingly or recklessly in issuing the materially false and misleading" Citron publications. (*Id.* ¶ 212). For example, during his alleged mission to drive up a certain "stock to [$]30," Plaintiff claims Defendant Left asked his colleague, "What can I put in a tweet to juice it?" (*Id.* ¶ 204) (internal quotation marks omitted). When discussing his receipt of 100 emails regarding a company's target price, he stated to his colleague, "NOT 1 of them was intelligent . . . . I swear not 1 person with a smart answer not 1 . . . [I] could write a tweet about a part 2 and get another $1." (*Id.* ¶ 115) (internal quotation marks omitted). On another occasion, Defendant Left allegedly stated, "[S]hort more cron [stocks] if we get 10.5 now that I know who owns it. [C]andy from a baby." (*Id.* ¶ 116) (internal quotation marks omitted). These statements are just a few examples, Plaintiff maintains, that demonstrate Defendant Left's awareness of exploiting his trusted platform to unlawfully gain profit from the market's trading trends.

Based on the Complaint's factual allegations, Plaintiff asserts the following five claims: 1) Defendants engaged in a fraudulent scheme to manipulate the market, in violation of Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act of 1934 ("Exchange Act") and Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") (collectively, "Claims I and II"); 2) Defendants made materially false and misleading statements, in violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act and Section 17(a)(2) of the Securities Act (collectively, "Claims III and IV"); and 3) Defendant Left acted as a "control person" of Citron Capital pursuant to Section 20(a) of the Exchange Act ("Claim V"). *See generally* (*id.* ¶¶ 216–30). Plaintiff's prayer for relief seeks, among other relief, a permanent injunction, disgorgement of funds, and civil penalties. *See* (*id.* at 43–45).

## II. LEGAL STANDARD

If a claim sounds in fraud or mistake, a court applies the heightened pleading standard of Federal Rule of Civil Procedure 9(b), requiring that such claims "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet this standard, a plaintiff must identify "the time, place, and content of [the] alleged misrepresentation[s]," as well as the "circumstances indicating falseness" or "manner in which the representations at issue were false and misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 (9th Cir. 1994) (cleaned up); *see also Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) ("Rule 9(b) requires a party to 'state with particularity the circumstances constituting fraud or mistake,' including 'the who, what, when, where, and how of the misconduct charged.'" (quoting *Vess v. Ciba—Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003))). Those allegations, in other words, "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Although the circumstances of the alleged fraud must be alleged with specificity, knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

A complaint that fails to meet this heightened standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). To survive a 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citation omitted).

When ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court is not "required to accept as true allegations that contradict exhibits attached to the Complaint," allegations that contradict "matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Seven Arts Filmed Ent., Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (citing *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)). Dismissal is appropriate if it appears the plaintiff can prove no set of facts in support of its claims that would entitle it to relief. *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1131 (9th Cir. 2020).

## III. DISCUSSION

### A. Defendants' Request for Consideration of Extrinsic Documents

As an initial matter, Defendants ask the Court to consider ten extrinsic documents under the incorporation-by-reference doctrine or alternatively, through judicial notice. *See* (ECF No. 19-2 ("Request for Judicial Notice" or "RJN")). Defendants rely heavily on this extrinsic evidence to argue for dismissal, contending that "[w]hen the omitted disclosures

are included, the misstatements corrected, the historical stock prices compared to the allegations made, and the immaterial allegations ignored, the SEC's theory of fraud falls apart." (Mot. at 8). Plaintiff objects to Defendants' requests as improper, (ECF No. 22 ("RJN Opp.")), and Defendants have replied to those objections, (ECF No. 23-1 ("RJN Reply")).

Generally, at the motion to dismiss stage, courts may not consider any material beyond the pleadings when assessing the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[R]eview is limited to the complaint." (internal quotation marks omitted) (quoting *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir.1993))). If a court considers such extrinsic evidence, "the motion must be treated as one for summary judgment under Rule 56[, and a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

Two exceptions, however, permit courts to consider extrinsic evidence "without converting the motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 688. First, pursuant to the "judicially created" incorporation-by-reference doctrine, courts may consider certain external documents "as though they are part of the complaint itself." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). The doctrine seeks to prevent "plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* Thus, a "defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Id.* (citing *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). A court may also "assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* at 1003 (alterations in original) (quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)). However, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.*

Under the second exception, "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 689 (internal quotation marks and citation omitted). Pursuant to Federal Rule of Evidence 201, a court may notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.* (b)(1), (2). Disputed facts contained in public records, however, are not subject to judicial notice. *Khoja*, 899 F.3d at 999.

The Ninth Circuit has acknowledged that both "judicial notice and incorporation-by-reference do have roles to play at the pleading stage," particularly when "assessing securities fraud claims." *Id.* at 998 (reviewing a lower court's grant of defendants' dismissal motion). The Circuit in *Khoja*, however, also "note[d] a concerning pattern in securities cases . . . : exploiting these [judicial notice] procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Id.* Indeed, "[t]he overuse and improper application of judicial notice and the incorporation-by-reference doctrine," the court proclaimed, essentially amounts to "unscrupulous use of extrinsic documents to resolve competing theories against the complaint." *Id.* Such improper use yields "unintended and harmful results"—namely, the risk of "premature dismissals of plausible claims that may turn out to be valid after discovery." *Id.* To be sure, this "risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access." *Id.*; *see also Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1285 (C.D. Cal. 2016) ("The Court's ultimate ruling on the Motion to Dismiss wouldn't change if its rulings on these requests for judicial notice were different, given that it generally had to take all well-plead factual allegations in the complaint as true."). With this in mind, the Court turns to each request.

1       1.    <u>Citron Research's Disclaimer and Published Report</u>

Defendants ask the Court to consider a "Legal Disclaimer" subpage found on Citron Research's website and a report published by Citron Research on the grounds that Plaintiff's Complaint incorporated by reference such documents. (RJN at 2–5). Plaintiff objects. *See* (RJN Opp. at 13–19).

The Court denies Defendants' request as to the Legal Disclaimer, as the Complaint neither references nor quotes the disclaimer at all. The Complaint specifically references other subpages, such as the "About Citron Research" page, found on Citron Research's website, but these referenced subpages are located separately from the disclosure subpage on the website. The cases relied upon by Defendants in support of finding incorporation are distinguishable, as they involved incorporated disclaimer terms that were included in the text of reports or articles, and the complaints extensively referenced those reports. *See, e.g., In re Nektar Therapeutics*, No. 18-CV-06607-HSG, 2020 WL 3962004, at *7–8 (N.D. Cal. July 13, 2020); *Miller v. PCM, Inc.*, No. LACV173364VAPKSX, 2018 WL 5099722, at *2 (C.D. Cal. Jan. 3, 2018). That is not the case here.

Further, although Defendants contend that "[m]any of the SEC's claims are indeed based on statements from Citron Research's 'written reports posted on the Citron Research website,'" which included its online disclaimer subpage, *see* (RJN at 11) (quoting Compl. ¶ 29), the Complaint does not reference the disclaimer subpage. Moreover, Defendants rely on the proposed disclaimer to challenge the elements of Plaintiff's fraud claims and, specifically, the issue of whether Defendants had a disclosure duty. *See* (Mot. at 11) (contending that these disclaimer terms relieved Defendants of any duty to disclose their trading positions, thereby "preclud[ing] the SEC from alleging a cognizable omissions-based fraud theory"). This use of the extrinsic evidence, which "merely creates a defense to the well-pled allegations in the complaint," is exactly the type of use considered improper at the motion to dismiss stage. *Khoja*, 899 F.3d at 1002–03 ("Submitting documents not mentioned in the complaint to create a defense is nothing more than another way of disputing the factual allegations in the complaint."); *see also In re Immune*

*Response Sec. Litig.*, 375 F. Supp. 2d 983, 995 (S.D. Cal. 2005) (declining notice of documents that the defendants offered "as evidence that [they] did not commit securities violation"); *Sec. & Exch. Comm'n v. NAC Found., LLC*, 512 F. Supp. 3d 988, 995 (N.D. Cal. 2021) (noting that "the truth" regarding the terms and conditions of an offering "doubtlessly will factor into later motions practice, if not trial. For the time being [], the document merely creates a defense to the SEC's allegations, and thus may not be incorporated into the complaint"); *Riley v. Chopra*, No. CV 18-3371 FMO (SKX), 2020 WL 5217154, at *2 (C.D. Cal. June 19, 2020).

The distinguishing facts in *Khoja* confirm this point. In that case, the Ninth Circuit upheld the lower court's decision to incorporate an article that "revealed the materiality of [defendant's] alleged misrepresentations and omissions," notably because the complaint itself alleged that the loss in defendant's "stock price occurred *because of* this article's revelations." 899 F.3d at 1005 (emphasis added). Indeed, the complaint explicitly stated that, "as a result of the . . . statements in the article, the price of [defendant's] stock plummeted." *Id.* Therefore, the complaint, the court reasoned, made "more than passing reference to the article." *Id.*

Here, the purported existence of a disclaimer does not "form the basis" of Plaintiff's fraud claims or the elements of such claims. Nevertheless, Defendants ask the Court to make two key inferences. First, Defendants' purported disclaimer adequately informed their readers that they have no duty to disclose internal trading activities. Second, in light of the disclaimer, no reasonable investor would find the publications—and particularly the omitted fact that Plaintiff alleges Defendants immediately traded contrary to their published target prices—misleading. As discussed below, the mere existence of a disclaimer, alone, does not automatically absolve one of his duty to disclose certain information to make his statements not misleading.[2] Accordingly, the Court will not

---

[2] As Defendants note, the Court acknowledges that "whether an omission makes an expression of opinion misleading always depends on the context, which includes all its surrounding text, including hedges, disclaimers, and apparently conflicting information."

consider Citron Research's online disclaimer, as such consideration would require inappropriately weighing Defendant's competing inference against Plaintiff's pleaded allegations. *See infra* note 3.

The Court nonetheless grants Defendants' request regarding Citron's report published on July 31, 2019. The Complaint, as Defendants note, not only substantively references the report's trading content but also quotes the report at least five times. *See, e.g.,* (Compl. ¶¶ 4, 18, 32, 37, and 50). Plaintiff correctly points out that "mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Tunac v. United States*, 897 F.3d 1197, 1207 (9th Cir. 2018); *see also* (RJN Opp. at 11). However, the Complaint's quote of and extensive references to the report to support Plaintiff's fraudulent misrepresentation allegations render the report "clearly integral to the Complaint." *Tunac*, 897 F.3d at 1207; *see also Khoja*, 899 F.3d at 1007 (finding that the lower court did not abuse its discretion by incorporating a report considering the complaint's "numerous references" to the report). Thus, the Court will incorporate and consider Citron's report.[3]

---

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017) (internal quotation marks omitted) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015)). A defendant's inclusion of a disclaimer, however, is only one piece to the puzzle, as courts are tasked with also considering "apparently conflicting information" in a defendant's statement.

[3] While the Court may consider the incorporated Citron report, Defendants' Motion only cites the report's disclaimer terms to support their positions that: (1) as a matter of law, Plaintiff's "omission-based fraud theory requires a duty to disclose the allegedly omitted material facts," and (2) considering the report's disclaimer terms, Defendants "informed readers" that they "owe[d] no disclosure duty," thereby relieving Defendants of any duty to disclose their internal trading activities. (Mot. at 7, 10–11). To counter, Plaintiff disputes whether the website's disclaimer adequately placed "investors on notice" that Defendants planned to immediately sell or buy "the entirety of their substantial holdings . . . far out of line with the target prices they recommended in the Citron Research Publications." (Opp. at 20). In any event, because the parties "dispute . . . what the report establishes," the Court declines to take judicial notice of the report's disclaimer terms. *Khoja*, 899 F.3d at 1001 (finding it improper to judicially notice a transcript because the

2.   <u>Public Records of Cease-and-Desist Orders and Third-Party Petition</u>

Defendants also request the Court take judicial notice of two cease-and-desist orders issued by the SEC, as well as a non-party's petition for proposed rulemaking.  These documents, Defendants maintain, warrant judicial notice because they are publicly available on Plaintiff's government website.  (RJN at 6).  "Courts routinely find SEC filings, as well as press releases, earnings calls, and other information made available to the market to be matters of public record, regardless of whether it was referenced in the complaint."  *M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*, No. CV 17-1479 PA (MRWX), 2017 WL 5635425, at *3 (C.D. Cal. Oct. 30, 2017) (collecting Ninth Circuit cases).  Thus, a court may take notice of the public records.

Notwithstanding, this Court declines Defendants' invitation to take judicial notice of these public records' content to infer, contrary to the allegations of the Complaint, that Defendants did not publish misrepresentations.  *Cf. Khoja*, 899 F.3d at 999 ("Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth.").  Specifically, Defendants rely on the SEC's cease-and-desist orders against two target companies as evidence confirming that Defendant Left's published opinion about the companies' fraudulent activities "proved so accurate that the SEC itself came to share his opinion."  (RJN Reply at 15).  Stated differently, to refute Plaintiff's fraudulent misrepresentation allegations, Defendants use these agency records to "demonstrate[] that Mr. Left's opinion" about the target companies "was not objectively untrue."  *Id.*  In response, Plaintiff contends that the cease-and-desist orders nonetheless do not contradict that Defendants allegedly

---

substance of the transcript remained subject to different interpretations); *see also Sgro v. Danone Waters of N. Am., Inc.*, 532 F.3d 940, 943 n.1 (9th Cir. 2008) (concluding that, despite incorporation of extrinsic documents, consideration of what the documents establish "in the context of a motion to dismiss" remained improper "where the parties disagree[d] as to whether the plan documents accurately reflect the terms of the plan as it was actually implemented").

"misrepresent[ed] their intended trading patterns around their publications." (RJN Opp. at 20).

The Court agrees with Plaintiff's position. Caselaw forecloses Defendants' proffered use of the public records. As courts have repeatedly emphasized, "[i]t is only appropriate . . . for the court to take judicial notice of the content of the SEC Forms and the fact that they were filed with the agency. *The truth of the content, and the inferences properly drawn from them, however, is not a proper subject of judicial notice under Rule 201.*" *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1032 (C.D. Cal. 2015) (emphasis in original) (cleaned up). Indeed, in *Gerritsen*, where a party relied "on the *truth* of the contents of the SEC filings to prove the substance of her claims," the court found it inappropriate "to take judicial notice of contents of the [SEC] documents for this purpose." *Id.* (emphasis in original).

Here, Defendants ask the Court to not only assume the truth of the SEC's orders—namely, that two of the twenty-three target companies discussed in Defendants' publications did engage in fraudulent activity—but, perhaps more problematically, also infer that Defendant Left did, in fact, "hold the belief he professed." (Mot. at 20). Judicial notice, however, is not the proper vehicle for the Court to weigh such competing inferences arising out of these extrinsic documents.[4]

Moreover, that the parties' reasonable dispute what facts these public records establish further restricts the Court's consideration of such documents. As cautioned by the Ninth Circuit, agency records generally remain "susceptible to judicial notice[,] . . . [b]ut, again ascertaining this factor is *only part* of the inquiry under Rule 201(b)." *Khoja*, F.3d at 1001 (emphasis added). Where the parties "reasonabl[y] dispute as to what the report establishes," courts cannot judicially notice such disputed facts. *Id.* (concluding a lower court abused its discretion when judicially noticing a disputed fact arising from an

---

[4] Further, even if the Court judicially noticed these documents, this proposed evidence does not make it implausible for reasonable investors to expect that Defendants would disclose their contradictory trading positions.

external agency report); *see also Lee*, 250 F.3d at 690 (finding that the lower court erred when it "did more than take judicial notice of *undisputed* matters of public record. The court took judicial notice of *disputed* facts stated in public records" (emphasis in original)). Accordingly, the Court denies Defendants' request to take judicial notice of the SEC's public records, insofar as Defendants seek to rely on such records to challenge the reasonable inferences drawn from Plaintiff's pleaded allegations.

### 3.   Historical Stock Price Data

Defendants request the Court take judicial notice of historic stock price data for four target companies that were the subject of Citron Research's publications.  (RJN at 7). Plaintiff objects on multiple grounds.   First, Plaintiff disputes the authenticity of Defendants' proffered exhibits, arguing that the documents lack "a label or bear any type of legend."  (RJN Opp. at 24).  Second, assuming the proposed exhibits present accurate stock price data, Plaintiff contends that whether Defendants' publications about the target prices "later proved to be true at some distant point in time . . . has no bearing on Defendants' scienter or whether [Defendants] believed in their statements at the time of the publication."  (*Id.* at 25).

Like judicial notice of public agency records, courts routinely take judicial notice of historical stock price data because such information is publicly available and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  *See Patel v. Parnes*, 253 F.R.D. 531, 547–48 (C.D. Cal. 2008) (collecting cases); *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 828 (N.D. Cal. 2019) (taking judicial notice of a Bloomberg stock table displaying historical stock prices because "[i]nformation about the stock price of publicly traded companies [is] the proper subject of judicial notice" (internal quotation marks omitted)), *aff'd in part, rev'd in part and remanded on other grounds by*, 84 F.4th 844 (9th Cir. 2023); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008); *SEC v. Mozilo*, No. CV09-3994HFWNABX, 2009 WL 3807124, at *7 n.2 (C.D. Cal. Nov. 3, 2009).  And here, defense counsel's declaration verifies that the data exhibits are "true and

correct" copies retrieved from NASDAQ's publicly available website.  (ECF No. 19-3 ("Spertus Decl.") ¶¶ 6, 8, 10, 11).  The declaration also includes hyperlinks to NASDAQ's historical stock price data, allowing Plaintiff and the Court to readily access and verify the accuracy of Defendants' exhibits.  Furthermore, the Court notes that Plaintiff does not question the accuracy of NASDAQ's underlying data, as courts often take judicial notice of data produced by NASDAQ.[5]  *See, e.g., City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, No. 12-CV-06039-WHO, 2013 WL 6441843, at *5 (N.D. Cal. Dec. 9, 2013) (taking judicial notice of NASDAQ reports of historical daily stock prices, SEC public filings, and analyst reports).  Thus, the historical stock prices are subject to judicial notice.

Nonetheless, as previously stated, taking judicial notice of the price data gets Defendants only but so far in their arguments.  Because the Ninth Circuit stressed that "judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth," *Khoja*, 899 F.3d at 999, the Court must carefully review Defendants' intended use of these exhibits.  Here, Defendants seek to use this data to prove that the stock prices did in fact align with their published predictions, thereby "foreclos[ing] the inference of falsity or scienter." (Mot. at 20); *see also* (*id.* at 21, 23, 27).  Well-settled precedent, however, counsels against this proposed use.  *See Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 913 (N.D. Cal. 2015) (noting that courts may "take judicial notice of the documents only for their existence and the existence of their contents, not for the truth of their contents"); *see also Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." (citation and internal quotation marks

---

[5] Plaintiff asserts that if the Court considers the trading data, Plaintiff will need to have an expert "issue opinions on issues such as external market forces and materiality." (RJN Opp. at 26).  Because, however, the Court's ruling neither assumes nor relies on the veracity of the price data, an expert's opinion regarding external market forces is unnecessary at this stage of the litigation.

omitted)); *Spy Optic, Inc. v. Alibaba.Com, Inc.*, 163 F. Supp. 3d 755, 763 (C.D. Cal. 2015) ("The court takes judicial notice only of the existence and contents of SEC filings, not the truth of information contained in them."). Thus, the Court's judicial notice will not include assuming the truth about whether the target companies' stock prices aligned with the prices reported by NASDAQ.

### 4. News Article

Lastly, Defendants request that the Court take judicial notice of a publicly available news article. (RJN at 8). Because publicly available news articles generally remain subject to judicial notice, the Court grants Defendants' request but declines to consider the truth of the article's content. *See Von Saher*, 592 F.3d at 960; *see also Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (taking judicial notice of news articles "but not for the truth of their contents").

### B.   Sufficiency of Plaintiff's Claims

Defendants advance multiple arguments for dismissal of the Complaint. First, they assert the Complaint fails to plead Plaintiff's fraud claims with particularity, as required by Federal Rule of Civil Procedure 9(b). Second, Defendants essentially argue the Complaint does not sufficiently plead its fraud allegations, including factual allegations that demonstrate Defendants issued misleading trading recommendations, as opposed to mere opinions. Third, Defendants contend that, even if Defendants' publications constitute opinions, Plaintiff has failed to adequately plead that such opinions rendered materially false and misleading statements. Fourth, Defendants advance that Plaintiff did not adequately plead allegations supporting proper exercise of extraterritorial jurisdiction. Lastly, Defendants argue Plaintiff's lawsuit violates Defendants' First Amendment and Due Process rights. The Court addresses each argument in turn.

### 1.   Adequacy of Plaintiff's Complaint Under Rule 9(b)'s Heightened Pleading Standard

Defendants contend that Plaintiff failed to plead fraud with particularity, as required by Federal Rule of Civil Procedure 9(b). Specifically, according to Defendants, the

Complaint lacked "a description of what was false about each alleged misrepresentation and why." (Reply at 11). Additionally, Defendants assert in their Reply that they "did not know the fraud theory" pleaded by Plaintiff "is based exclusively on 'contra-recommendation trading'" because such "phrase" did not "appear in the Complaint." (Reply at 10). Defendants thus argue that Plaintiff may not use its Opposition to subsequently clarify its liability theory. (*Id.*).

Regarding Defendants' first argument, the Court finds the Complaint satisfies its burden of pleading fraud with particularity. The Complaint and attached Appendix A describes, among other facts, multiple examples of Defendants issuing Citron publications to the market about Defendant Left's trading positions and intended trading activity when Defendants were, in reality, allegedly trading inconsistently with Citron Research's recommendations to the market. *See e.g.,* (Compl. ¶¶ 90–146, 168–73, 184–90, 196–98, 200–07 and Appendix A). These allegations contain dates when the allegedly false and misleading statements were made, the target companies that were the subject of the statements, the method by which the statements were made, the content of the statements, and the factual basis upon which Plaintiff alleges the statements were knowingly false and material. Additionally, the Complaint alleges facts to show Defendants inconsistent trading activities amounted to "half-truths" because "a reasonable investor would have wanted to know that Defendants made false representations about their intentions to follow their own recommendations." *See e.g.,* (*id.* ¶¶ 60, 186). The Court thus finds that the Complaint's allegations are pleaded with particularity and provide Defendants adequate notice. *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) ("Perhaps the most basic consideration for a federal court in making a judgment as to the sufficiency of a pleading for purposes of Rule 9(b) . . . is the determination of how much detail is necessary to give adequate notice to an adverse party and enable that party to prepare a responsive pleading." (internal quotation marks omitted) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1298 (3d ed. 2016))).

Although the Motion challenges the sufficiency of the pleading under Rule 9(b) by attempting to parse through and refute Plaintiff's fraud allegations and theory with extrinsic evidence, Defendants' factual challenge is premature. For the reasons stated previously in Section III.A., at this stage of the proceedings, the Court accepts all material allegations in the Complaint as true and declines to consider Defendants' proffered extrinsic evidence, insofar as Defendants rely on such evidence to refute the truth of the Complaint's allegations.

Further, though Defendants contend that they "did not know the fraud theory" pleaded by Plaintiff "is based exclusively on 'contra-recommendation trading'" because such "phrase" did not "appear in the Complaint," (Reply at 10), the Court finds the pleadings sufficiently placed Defendants on fair notice about this theory of liability. At its core, the Complaint asserts that Defendants made materially false and misleading statements in Citron's publications by presenting trading recommendations to the readers, when in fact Defendants actually intended and took actions in direct contradiction to their statements. (Compl. ¶ 186); *see also* (*id.* ¶ 64) ("Left's strategy focused specifically on taking advantage of unsuspecting investors who followed Citron Research's recommendations, yet who did not know of Left and Citron Capital's plan to quickly sell or purchase contrary to Citron Research's recommendations, and at a price far different than the price targets Citron Research provided."). As such, the absence of the term "contra-recommendation trading" in the Complaint is of no moment, as Defendants received adequate notice to prepare a responsive pleading based on the well-pleaded allegations in the Complaint. Accordingly, Plaintiff has satisfied Rule 9(b)'s heightened pleading standard for its fraud allegations.

### 2. Claims I and II: Plaintiff's Fraudulent Scheme Claims

Claims I and II of the Complaint allege that Defendants operated a fraudulent scheme with the ultimate goal of "captializ[ing] on the price movements [Defendant Left] created." (*Id.* ¶ 85). Such activities, Plaintiff asserts, violate Sections 17(a)(1) and (3) of the

Securities Act, Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) thereunder. *See* (*id.* ¶¶ 216–21).

Section 17(a)(1) forbids any person, "in the offer or sale of any securities," from employing "any device, scheme, or artifice to defraud." 15 U.S.C. § 77q(a)(1). Relatedly, Section 17(a)(3) prohibits any person from engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." *Id.* (a)(3).[6] Defendants' publishing and trading activities, according to Plaintiff, constitute a fraudulent scheme that recommends investors buy or sell securities while deceptively intending to make trades contrary to such recommendations.[7]

Defendants' challenge to Plaintiff's contra-recommendation trading theory rests, in part, on whether Citron's publications encompassed investment *recommendations* as opposed to investment *opinions*. Relying on, among other items, the disclaimer on Defendant Citron's website and Black's Law Dictionary's definition of the term "recommendation," Defendants argue that the Citron publications merely consisted of "opinions," not recommendations, that neither encouraged nor induced Citron Research's readers to make certain trade decisions, thereby distinguishing Defendants' statements from other statements triggering fraud liability in "scalping" cases. (Reply at 14–16). As stated previously, however, at this stage of the proceedings, the Court accepts all material allegations in the Complaint as true and declines to consider such extrinsic evidence to refute the truth of the Complaint's allegations. Moreover, the Complaint's allegations that, among other deceptive conduct, Defendants recommended others buy or sell the stock of target companies, while concealing Defendant Left's intent to act in a manner that was

---

[6] Similarly, Rules 10b-5(a) and (c) prohibit any person—whether "directly or indirectly"—from employing any scheme to defraud, or engage in any act, practice, or course business that operates as a fraud or deceit upon any person in connection with the purchase or sale of securities. 17 CFR § 240.10b-5(a), (c); *see also* 15 U.S.C. § 78j(a).

[7] As Plaintiff notes, courts often refer to such deceptive practices as "scalping." (Opp. at 18 n.5). The parties, however, also refer to this practice as "contra-trading recommendation." For the sake of clarity and consistency, the Court also refers to the practice as "contra-trading recommendation."

contrary to that recommendation, present sufficient facts to support Plaintiff's fraudulent scheme theory of liability. *See, e.g., SEC v. Beck*, No. 2:22-CV-00812-FWS-JC, 2024 WL 1626280 (C.D. Cal. Mar. 26, 2024) (holding that the defendant engaged in a fraudulent scheme by promoting his stock picks using his email and Twitter without indicating that the defendant "owned, and planned to sell, shares of the stock he recommended subsequent to the email and Twitter promotions").

Further, as Plaintiff correctly points out, even if Defendants' statements constitute opinions, this, alone, does not preclude Defendants' statements from being actionable. *See Omnicare*, 575 U.S. at 175. In *Omnicare*, the Supreme Court, in an action under § 11 of the Securities Act of 1933, considered "when, if ever, the omission of a fact can make a statement of opinion . . . even if literally accurate, misleading to an ordinary investor." *Id*. at 187. Omnicare argued that no reasonable person, in any context, could understand "a pure statement of opinion to convey anything more than the speaker's own mindset." *Id.* The Supreme Court, however, found that Omnicare was taking its point "too far, because a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id.* at 188. The *Omnicare* opinion established three different ways in which a plaintiff may allege facts demonstrating the falsity of an opinion statement. The plaintiff may allege facts demonstrating: (1) "the speaker did not hold the belief [the speaker] professed" and that belief is objectively untrue, *id.* at 186; (2) the speaker supplied in an opinion statement a supporting fact that was untrue, *id.*; or (3) the speaker omitted material facts going to the basis of the speaker's opinion, and such omission made the opinion statement misleading to a reasonable person reading the statement fairly and in context, *id.* at 194.

The Ninth Circuit has applied the standards set forth in *Omnicare* to Section 10(b) and Rule 10b-5 claims. *See City of Dearborn*, 856 F.3d at 616 ("Although *Omnicare* concerned Section 11 claims, we conclude that the Supreme Court's reasoning is equally

applicable to Section 10(b) and Rule 10b-5 claims."). Accordingly, the Court rejects Defendants' suggestion that Defendants' mere statement of an opinion, alone, precludes liability.

3.    <u>Claims III and IV: Plaintiff's False Statements Claims</u>

In addition to its scheme liability claims, Plaintiff raises two claims against Defendants for making materially false or misleading statements pursuant to Section 10(b) and Rule 10b-5(b) of the Exchange Act and Section 17(a)(2) of the Securities Act. *See* (Compl. ¶¶ 222–27). Section 10(b) and Rule 10b-5(b) forbid "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 CFR § 240.10b-5(b). Similarly, Section 17(a)(2) prohibits "obtain[ing] money or property" by virtue of the same conduct prohibited by Section 10(b) and Rule 10b-5(b). 15 U.S.C. § 77q(a)(2). In a public enforcement action, "the SEC must prove four elements to establish a misrepresentation violating Rule 10b–5, and a fifth element to establish the need for an injunction: (1) a material misrepresentation, (2) in connection with the purchase or sale of a security, (3) scienter, (4) use of the jurisdictional means, and (5) a reasonable likelihood of future violations." *S.E.C. v. Rana Rsch., Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993); *see also S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010).

Plaintiff theorizes that Defendants' publications presented misleading half-truths because reasonable investors would want to know that, in reality, Defendants intended to "immediately reverse their positions and trade contrary to those recommendations." (Opp. at 21). To counter, Defendants argue that, assuming Citron's publications consisted of opinions, instead of recommendations, Plaintiff nonetheless fails to allege "sufficient facts to support an inference that Mr. Left's opinions were false . . . ." (Reply at 18). Engaging in trading decisions contrary to the target prices stated in the publications, Defendants maintain, does not "support a reasonable inference that the target price opinions were false." (*Id.* at 17).

-22-

Defendants' representation of the Complaint oversimplifies and disregards numerous factual allegations raised therein.  As a preliminary matter, the Supreme Court established that "half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 (2016).  Indeed, the Court, in its most recent term, declared that Rule 10b–5(b) "requires disclosure of information necessary to ensure that statements already made are clear and complete."  *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024).  In other words, this Rule "therefore covers half-truths . . . ."  *Id.*  Thus, under Rule 10b-5, even when there is no existing independent duty to disclose information, disclosure is nonetheless "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'"  *Id.*  (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).  "[T]he Rule requires identifying affirmative assertions (i.e., statements made)" and then "determining if other facts are needed to make those statements not misleading." *Id.*  (cleaned up); *see also Omnicare*, 575 U.S. at 189 (2015) (noting that liability may arise where a "statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion" and such "facts conflict with what a reasonable investor would take from the statement itself"); *City of Dearborn Heights Act*, 856 F.3d at 615–16 (same).

With this framework in mind, the Court finds that Plaintiff has adequately pleaded its false statement claims.  Assuming the truth of Plaintiff's allegations, the Defendants did not simply present opinions about the trajectory of stock prices.  Instead, as alleged, Defendants presented half-truths by intentionally informing readers of their own short or long exposure in certain stocks with the primary goal of influencing readers to make similar trades.  According to Plaintiff, however, at the time the statements were made, the Defendants always intended to trade contrary to those published target prices and, most importantly, never shared this inconsistent intent with their readers.  In fact, Defendant Left allegedly touted this operation as a means to obtain ill-gotten profit, signaling that he

intended to deceptively induce his readers to buy or sell at those promoted target prices. *See, e.g.,* (Compl. ¶ 62) (alleging that Defendant Left stated "creating a catalyst is the best way to make money"); (*id.* ¶ 63) (alleging that Defendant Left instructed a business partner to "[t]rade on [the] day of [an] article or day before and max $50k in options, get out immediately on catalyst . . . STOP GAMBLING, run a fund . . . ONLY PLAY CATALYST"); (*id.* ¶ 65) (alleging that Defendant Left told others: "[T]hese retail holders are nervous. [W]e will hit them . . . Now that I know who owns [the target stock]. [C]andy from a baby" (internal quotation marks omitted)).  Defendants' briefing does not address these alleged private statements.  In any event, the law supports Plaintiff's theory that once Defendants "speak on an issue or topic"—namely, stating their trade positions for investors to follow—then Defendants have "a duty to tell the whole truth"—namely their underlying intent to trade inconsistently with their published target prices.  The duty to disclose such intent remained crucial because, absent this information, Defendants' publications in effect concealed from readers the Defendants' true intent to make trades contrary to their stated positions.  The Court can infer at this stage of the proceedings that a reasonable investor would have wanted to know such information.  Thus, Defendants argument—simply labeling these statements as protected "opinions"—does not demonstrate that the Complaint's allegations are deficient.  Therefore, assuming the allegations are true, as the Court must do at this stage of the proceedings, Plaintiff has sufficiently pleaded its false statement claims.

## C.   Extraterritorial Jurisdiction

Defendants also raise an extraterritorial jurisdiction argument, specifically contending that Plaintiff may not use domestic securities laws to reach the alleged deceptive practices concerning the Namaste Technologies, Inc. ("Namaste") stock.  (Mot. at 25–27).  Plaintiff opposes, arguing that Defendants, while in the United States, took significant steps in furtherance of violating securities laws that rendered substantial effects within the United States.  (Reply at 32).  The Court agrees.

For factual context, Plaintiff alleged that Defendants traded Namaste stocks contrary to their recommendations pursuant to an arrangement with Anson Advisors, a Canadian-based fund. Securities for Namaste are traded on the Canadian Securities Exchange and traded as a penny stock in the United States. (Compl. ¶ 158). According to Plaintiff, in September 2018, Anson Advisors agreed to pay Defendant Left a share of its profits from its short position in Namaste if he issued a "short recommendation on Namaste" through the Citron Research platform. (*Id.* ¶ 159). Defendant Left agreed, allegedly stating, "DONE . . . let me kill it . . . these retail holders are nervous. [W]e will hit them." (*Id.* ¶ 160). Citron Research then tweeted a series of negative tweets about Namaste that, Plaintiff alleges, influenced readers to sell their Namaste stock. (*Id.* ¶¶ 162–63). In fact, to amplify this recommendation to sell Namaste stock, Defendant Left allegedly created a website entitled "namastetruth.com" to post disparaging information about Namaste. (*Id.* ¶ 167). Defendant Left also informed Anson that he "might take down the namaste website . . . only to put it back up . . . if the stock goes higher," indicating that he employed the website as a means "to impact prices for his own personal profit." (*Id.*). However, contrary to recommending investors sell their Namaste stock at a target price of $0.25, Defendant Left agreed that Anson Advisors would cover approximately 1/3 of the holdings in Namaste, "meaning that Anson would buy back Namaste stock [from Left], at a time when the stock was trading at approximately $2.36." (*Id.* ¶ 164).

Assuming the truth of these factual allegations, Plaintiff has adequately pleaded that Defendants' conduct within the United States constituted significant steps in furtherance of securities violations, thereby falling within the parameters of extraterritorial jurisdiction.[8] Specifically, Defendant Left, as a California resident at the time, arranged a

---

[8] Defendants erroneously assert that the Supreme Court's decision in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) forecloses Plaintiff's exercise of extraterritorial jurisdiction for its fraud claim involving Namaste securities. (Mot. at 25). Defendants fail to acknowledge that, in response to *Morrison*, Congress enacted the 2010 Dodd-Frank Act, conferring extraterritorial jurisdiction when a public securities enforcement action, such as this one, concerns "(1) conduct within the United States that constitutes significant steps

scheme with Anson and then published Namaste target prices for the ultimate purpose of receiving a share of Anson's profits from its short position in Namaste. Further, Defendants again engaged in contra-recommendation trading by allegedly planning to sell the Namaste stock to Anson at a price significantly higher than the target selling price that they suggested to readers. Such acts, all of which took place in the United States, constitute significant steps in furtherance of fraudulently making contra-trading recommendations with the covert plan of obtaining profit.[9] Accordingly, the Court finds that extraterritorial jurisdiction remains proper based on Plaintiff's pleaded facts.[10]

---

in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States." 15 U.S.C. § 77v(c); *see also id.* § 78aa(b). To that end, in determining whether extraterritorial jurisdiction is proper, courts often employ the "conduct or effect test." *See, e.g., Sec. & Exch. Comm'n v. Liu*, 549 F. Supp. 3d 1087, 1092 (C.D. Cal. 2021), *aff'd sub nom. U.S. Sec. & Exch. Comm'n v. Liu*, No. 21-56090, 2022 WL 3645063 (9th Cir. Aug. 24, 2022); *United States Sec. & Exch. Comm'n v. Passos*, No. 1:22-CV-3156-GHW, 2024 WL 5203022, at *14 (S.D.N.Y. Dec. 21, 2024); *see also Daramola v. Oracle Am., Inc.*, 92 F.4th 833, 839 (9th Cir. 2024); *Sec. & Exch. Comm'n v. Morrone*, 997 F.3d 52, 60 n.7 (1st Cir. 2021).

[9] Defendant Left also advocates that he made statements about Namaste on BNN Bloomberg, a Canadian-based news show, and therefore did not take steps in furtherance of alleged securities fraud in the United States. (Reply at 19). This one fact, however, does not rebut the additional steps he allegedly took within the United States to engage in securities fraud.

[10] The Court also finds Defendants' First Amendment and Due Process violation claims unavailing. *See* (Mot. at 28–31). First, it is well-settled that the "First Amendment does not shield fraud." *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) (emphasizing that "the government's power 'to protect people against fraud' has 'always been recognized in this country and is firmly established'" (quoting *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948))). This action does not result in any purported "chilling effect . . . on the flow of truthful information to the markets," (Mot. at 29), because it is centered on the improper use of a trusted platform to influence readers' trading decisions with the underlying intent to immediately trade contrary to the promoted target price. Second, Plaintiff's action is not novel or "unresolved" and therefore does not lack fair notice. (Reply at 20). Defendants' argument that "it is unresolved whether short

## IV.    CONCLUSION

For the foregoing reasons, the Court denies Defendants' Motion.

**IT IS SO ORDERED.**

DATED:  April 22, 2025

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

---

sellers" have a "duty . . . to update a position disclosure" when they no longer hold such "trading intention" misinterprets the core basis of Plaintiff's action. (*Id.*). Plaintiff does not merely allege that Defendants shared their trade positions and then subsequently changed their trading decisions after further consideration. Instead, Plaintiff alleges that Defendants always intended to trade contrary to their publications, thereby using their platform as a fraudulent scheme to gain profit from the market; such allegations do not present circumstances where a short seller activist genuinely changed his mind about a trade subsequent to releasing a trade publication. Again, this inference is well-supported by the allegations that Defendant Left often touted his use of the Citron platform as a "catalyst" to influence trading trends.